# United States Court of Appeals
### For the Eighth Circuit

_____

No. 17-1341
_____

Lincoln Benefit Life

*Plaintiff - Appellant*

v.

James W. Wilson

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Nebraska - Lincoln

_____

Submitted: May 17, 2018
Filed: October 30, 2018

_____

Before SMITH, Chief Judge, BEAM and COLLOTON, Circuit Judges.

_____

SMITH, Chief Judge.

Lincoln Benefit Life ("Lincoln Life") sued its former agent, James W. Wilson ("Wilson"), for damages it incurred in a lawsuit brought by a policyholder who purchased a Lincoln Life policy through Wilson. Wilson counterclaimed, seeking

withheld commissions and bonuses from the sale of that policy. The district court[1] granted Wilson summary judgment with respect to Lincoln Life's claims for damages on the basis that they were barred by collateral estoppel. At the close of the jury trial of the remaining claims, the court entered judgment as a matter of law in favor of Wilson. Lincoln Life now appeals. We affirm.

## I. *Background*[2]

At all relevant times, Wilson worked as a life insurance broker, tasked with signing up policyholders for insurance companies, including Lincoln Life. He worked with Lincoln Life pursuant to a Special Agent's Agreement ("Agent's Agreement"). He received commissions on the premiums paid by policyholders he brought to the company.

Samuel Gindi ("Samuel") was a cofounder and, along with several of his family members, a large shareholder of Lollytogs, Inc. ("Lollytogs"), a wholesaler/ distributor of children's clothing. In or around 1999, Samuel, along with other shareholders and Lollytogs executives, approached Wilson about obtaining a life insurance policy. The purpose of the policy was to allow the members of the Sutton family, the other major shareholders of Lollytogs, to buy out the Gindis upon Samuel's death. The Gindis and Suttons executed a trust agreement to that effect. It required the proceeds of any policy to be held in trust.[3] The interested parties sought

---

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

[2]The facts recited in this section come, in substantial part, from the trial record in the underlying litigation, *G Inv'rs Holding LLC v. Lincoln Benefit Life Co.*, No. 1:09-cv-02980 (S.D.N.Y.) ("prior action"). The parties filed that record in this case by order of the district court.

[3]For ease of reference, from this point forward, we use "Lollytogs" to collectively refer to the company, the Gindi and Sutton families, and their representatives with respect to the policy unless otherwise noted.

a convertible life insurance policy.[4] Samuel was 75 years old at this time.

Wilson submitted Samuel's information to Second Opinion, a brokerage agency. Second Opinion received proposals from a number of insurance companies. After negotiations, Lollytogs accepted Lincoln Life's offer. In late 1999, Lincoln Life issued two policies on Samuel's life; one insured him for $3 million, and the other for $26 million. Wilson submitted a complete and accurate application

> The $3 million policy was to be in effect from October 1, 1999 through October 1, 2019, with a level premium period expiring on October 1, 2009, while the $26 million policy was to be in effect from November 8, 1999 through November 8, 2019 with a level premium period expiring on November 8, 2009.

Appellee's Br. at 5.[5] Lollytogs understood that both policies included a conversion provision.

---

[4]Under such a policy, Samuel would be insured under a term life policy and, after the passage of a certain time set forth in the policy, have the option to change, or convert, the policy into an adjustable or whole life policy without having to go through the underwriting process again. *See Insurance*, Black's Law Dictionary (10th ed. 2014) (defining "convertible insurance" as "[i]nsurance that can be changed to another form without further evidence of insurability, usu. referring to a term-life-insurance policy that can be changed to permanent insurance without a medical examination").

[5]We note that in the absence of an order permitting him to do so, Wilson filed a "corrected" brief intended to fix two deficient record citations. Lincoln Life moved to strike Wilson's corrected brief. Wilson responded that counsel inquired with the Clerk's office (seemingly by phone) as to how best to address the issue and was told that due to the nature of the corrections, he could submit his brief without leave. However, under Eighth Circuit Rule 27A(5), "corrections in briefs" are among the matters for which the Clerk "has discretion to enter orders on behalf of the court." This implies that an order is required to file a corrected brief. Additionally, the corrected brief was filed after the time for briefing had expired, and Lincoln Life had already filed its reply brief. Accordingly, we grant Lincoln Life's motion to strike and hold Wilson to his initially filed brief.

Lollytogs began making payments on both policies before receiving the written policies. The written policies were issued, respectively, in November 1999 and January 2000. However, there was a problem. The written policy contained conflicting terms as to the conversion rights. As requested, the policies provided a right of conversion at the end of the ten-year level premium period. Though the premium for the converted policies would be set "based on the insured's sex, the premium class applicable to [the] policy, and the insured's age [at conversion]," "[n]o new evidence of insurability [would] be required." Decl. of Joshua Mallin, Ex. 6, at 10, *Lincoln Benefit Life v. Wilson*, Case No. 4-13-cv-03210-RGK-CRZ (Feb. 13, 2014), ECF No. 23-7. A converted policy would afford Lollytogs a more favorable premium level than a term policy once the level premium period ended. Unfortunately, the policies also contained language that required that any conversion right must be exercised by the earlier of either one year after the insured's 70th birthday or the end of the level premium period. As stated earlier, Samuel was already 75 and thus the earlier event had already occurred several years prior to the issuance of the policies. Recognizing a problem, a Lollytogs representative informed Wilson of the issue and asked for clarification. Wilson contacted Lincoln Life about the matter. In July 2000, Lincoln Life customer service representative Lydia Trevino responded by fax ("2000 Fax"):

CONVERSION:

Each plan is convertible during the level premium period or to age 70, if earlier, to any whole life or f[le]xible premiums adjustable life plan then sold by us which has a higher required premium (as of the date of conversion).

When speaking with Stan Shelley, Vice President of our Customer Service Department. [sic] This policy will have conversion privileges up to the term of the policy. This is limited to what product the client may go into based on current age.

Decl. of Joshua Mallin, Ex. 2., at 2, *Lincoln Benefit Life v. Wilson*, Case No. 4-13-cv-03210-RGK-CRZ (Feb. 13, 2014), ECF No. 23-3. That same day, Trevino made a note of this issue in an internal email:

> [Agent] called and wanted verification on Conversion rights.[]
>
> Spoke with Dan Hertzel and he verified with Stan Shelley that since it is verb . . [.]
>
> Each plan is convertible during the level premium period.[] [W]e will allow this to be converted to any whole life or flexible prem[ium] adjustable life plan sold by us which is higher in required premium.[] However customer would be limited to certain products based on his current age.
>
> [A] fax was sent to the agent with this information.

Decl. of Joshua Mallin, Ex. 9, at 2, *Lincoln Benefit Life v. Wilson*, Case No. 4-13-cv-03210-RGK-CRZ (Feb. 13, 2014), ECF No. 23-10. Second Opinion employee Kourtney Harris, referencing information from a Lincoln Life employee, advised Lilly Phan, Wilson's executive secretary, similarly in a late 2002 email: "[T]his policy is able to be converted to a permanent product." Decl. of Joshua Mallin, Ex.10, at 2, *Lincoln Benefit Life v. Wilson*, Case No. 4-13-cv-03210-RGK-CRZ (Feb. 13, 2014), ECF No. 23-11. When Phan responded by asking whether this would be the case for next four years, Harris replied, "Yes. They are convertible thru the level premium paying period. These are 10 yr level terms so they are convertible thru the entire 10 yrs." *Id.* However, in early 2003 when Lollytogs inquired as to the costs of converting the policy, Lincoln Life stated that the 2000 Fax was a mistake and offered Lollytogs the opportunity to covert the policies under conditions much less favorable than those set forth in the policies. These new terms would have raised premiums substantially and limited Lollytogs conversion options.

In May 2007, Stephen Carb, Trustee of Lollytogs, Inc., Trust, contacted Lincoln Life to convert the policy to either a Flexible Premium Adjustable Life Plan or a Whole Life Plan. Following another debate as to whether the policy was convertible, Lincoln Life denied the convertability of the policies based on the age provision.

Lollytogs sued Lincoln Life in 2009 in the Southern District of New York.[6] The suit asserted claims for breach of contract and reformation and sought a declaratory judgment requiring Lincoln Life to allow the conversion of the policies. Samuel died in 2012 while the case was still pending. The case went to the jury, which found in favor of Lollytogs based on the following interrogatories:

1. Did Plaintiff prove by a preponderance of the evidence that the Plaintiff had the right to convert the Term Policies to whole or universal life policies at the time the Term Policies were sold in 1999?

   YES ✓ NO

2. Did Plaintiff prove by a preponderance of the evidence that the July 13, 2000 Fax modified the subject Term Policies and gave Plaintiff the right to convert the Term Policies to whole or universal life insurance policies through the end of the level premium periods?

   YES ✓ NO

---

[6]While Carb initiated the litigation, "the trust's successor in interest, G Investor Holdings, LLC, was later substituted as the plaintiff." *Lincoln Benefit Life v. Wilson (Lincoln I)*, No. 4-13-cv-03210-RGK-CRZ, 2015 WL 9048679, at *2 n.4 (Dec. 16, 2015).

3. Based upon the law of estoppel as I have charged you, is Defendant estopped from denying that these policies have conversion rights based upon its conduct?

   YES ✓ NO

4. Based upon the law of waiver as I have charged you, did Defendant relinquish any right it had to deny Plaintiff the right to convert the policies?

   YES ✓ NO

5. Did Defendant prove by a preponderance of the evidence that Plaintiff accepted Defendant's one time, limited offer to convert the subject Term Policies to whole or universal life policies by the February 26, 2003 letter?

   YES NO ✓

6. Write in the amount due to Lincoln in unpaid premiums:

   $7,309,370

7. Did Plaintiff prove by a preponderance of the evidence that Defendant breached the contract by failing to pay the Death Benefit ($29 million)?

   YES ✓ NO

*Id.* at *11–12 (citation omitted).[7] Based on the jury's findings, the district court for the Southern District of New York court entered judgment in favor of Lollytogs for the value of the death benefit plus interest.[8]

After its loss to Lollytogs, Lincoln Life brought suit against Wilson in Nebraska state court. Lincoln's suit alleged claims for a right to indemnity or contribution, breach of contract, and negligence, and sought a declaratory judgment that it owed Wilson no additional commissions. The gravamen of its case alleged that Wilson sold convertible life insurance policies to a man over 70 years old in contravention of his training and clearly expressed company policy. Wilson removed the case based on diversity jurisdiction, asserting that he was a resident of Connecticut and that Lincoln Life was a Nebraska corporation with its principal place of business in Nebraska. *See* 28 U.S.C. § 1332(a)(1). Wilson also counterclaimed for commissions on the premiums Lollytogs paid to Lincoln following the trial in the New York lawsuit.

Following discovery, both parties moved for summary judgment. The district court advised them that it was leaning towards holding that Lincoln Life's damages claims against Wilson were collaterally estopped. The court directed them to file briefs on that issue along with the record from the prior action in New York. Upon review, the court determined that the jury's findings precluded a finding of liability against Wilson on claims made by Lincoln Life. Therefore, the court relied on the doctrine of collateral estoppel to dismiss all of Lincoln Life's claims that were based

---

[7]Contrary to the district court's memorandum and order and the jury's verdict, Westlaw's citation inaccurately reflects that the jury answered "yes" to question 5. Our opinion corrects this error and accurately reflects the jury's answer of "no" to question 5.

[8]This amount was offset somewhat, however, by the approximately $7 million Lollytogs placed in escrow by order of the court in the prior action. This sum represented the premiums that went unpaid from 2009 to 2012.

on allegations that Wilson had acted improperly. In addition, the court precluded Lincoln Life from asserting as a defense against Wilson's counterclaim that he "breached the agent's contract in connection with the sale of the term life insurance policies."*Lincoln I*, 2015 WL 9048679, at \*16. The only defense that remained to Lincoln Life was a limited failure of consideration affirmative defense.

After a two-day jury trial on Wilson's commission claims, Wilson moved for judgment as a matter of law. *See* Fed. R. Civ. P. 50. The court granted it, finding that (1) Wilson had produced the policies on behalf of Lincoln Life as required by the parties' agreement, and (2) to the extent that he was required to take further steps to secure his commission, Lincoln Life had prevented him from doing so. The court determined that Wilson was entitled to $970,778.39 in commissions, $120,000 in bonuses,[9] and $484,245 in prejudgment interest.

Following entry of judgment, Lincoln Life appeals the summary judgment order, the pretrial orders, and the order granting judgment as a matter of law.

## II. *Discussion*

The thrust of Lincoln Life's argument is that the issues in this case and the prior action in New York are not "identical," as the doctrine of collateral estoppel requires. *See, e.g.*, *D'Arata v. N.Y. Cent. Mut. Fire Ins. Co.*, 564 N.E.2d 634, 636 (N.Y. 1990) (citation omitted). In Lincoln Life's view, the two cases addressed different issues. Lincoln sees its case against Wilson as focusing on errors he made in the course of the Lollytogs deal. The prior action, on the other hand, addressed whether Lincoln Life was required to allow Lollytogs to convert the policy from term to whole life. Lollytogs argues that the prior action did not require a finding that

---

[9]The parties stipulated to the amount of the commissions. They also stipulated that bonuses of $120,000 were appropriate if commissions in the stipulated amount were appropriate.

Wilson was blameless for Lincoln Life's liability to the trust. Additionally, Lincoln Life finds fault with the district court's culling of many of its defenses before trial based on its collateral estoppel ruling. Lastly, it challenges the award of prejudgment interest. We affirm each of the district court's rulings.

## A. *Summary Judgment*

> We review a district court's decision to grant a motion for summary judgment de novo, applying the same standards for summary judgment as the district court. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. In considering summary judgment motions, the burden of demonstrating there are no genuine issues of material fact rests on the moving party, and we review the evidence and the inferences which reasonably may be drawn from the evidence in the light most favorable to the nonmoving party. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

*Estate of Johnson v. Weber*, 785 F.3d 267, 271 (8th Cir. 2015) (cleaned up). We review de novo the district court's application of collateral estoppel. *Manion v. Nagin*, 392 F.3d 294, 300 (8th Cir. 2004) (citation omitted). As this is a diversity case, our goal is to determine whether a New York court would hold that collateral estoppel applies to these facts. *See Ideker v. PPG Indus., Inc.*, 788 F.3d 849, 852 (8th Cir. 2015) (citations omitted). Collateral estoppel requires that the decisive issue in the subsequent action be identical to one necessarily decided in the prior action and the party against whom collateral estoppel has been invoked must have had a full and fair opportunity to litigate the issue:

> Collateral estoppel, an equitable doctrine, is based upon the general notion that a party, or one in privity with a party, should not be permitted to relitigate an issue decided against it. As this doctrine has evolved, only two requirements must be satisfied. First, the party seeking the benefit of collateral estoppel must prove that the identical

issue was necessarily decided in the prior action and is decisive in the present action. Second, the party to be precluded from relitigating an issue must have had a full and fair opportunity to contest the prior determination. . . . Collateral estoppel, we have held, is grounded on concepts of fairness and should not be rigidly or mechanically applied.

*D'Arata*, 564 N.E.2d at 636 (citations omitted). "[T]he burden of showing that the issue was identical and necessarily decided rests upon the moving party." *Schwartz v. Pub. Adm'r of Bronx Cty.*, 246 N.E.2d 725, 730 (N.Y. 1969). It is the resisting party's burden to show that it lacked a "full and fair opportunity" to litigate the issue. *Id.* In determining whether collateral estoppel applies, we may look to the entirety of the record of the prior action. *See Bronxville Palmer, Ltd. v. State*, 18 N.Y.2d 560, 563, 223 N.E.2d 887 (1966). We hold that the jury's findings preclude a subsequent finding of liability against Wilson.

When asked to decide whether the policies were convertible when sold, the jury answered "Yes." The district court held that the jury's answer in the affirmative was "either based upon a determination that the term polices' conversion language is ambiguous, or upon a determination that Wilson was authorized by [Lincoln Life] to sell the policies with conversion rights and that the policies as delivered did not reflect the terms of the sale." *Lincoln I*, 2015 WL 9048679, at *15. Though the record leaves us unsure that the jury's decision was based on the ambiguity argument, as Lincoln Life conceded below, the ambiguity argument is but one basis that would preclude a finding that Wilson is liable for some mistake made during the sale of the policy. *See id.* at *12 ("If the jury's answer to the first question was based on an interpretation of the policy language, Lincoln Benefit agrees that collateral estoppel would bar the present claims." (quoting Suppl. Mem. in Opp'n to Wilson's Mot. for Summ. J. at 18, *Lincoln Benefit Life v. Wilson*, Case No. 4-13-cv-03210-RGK-CRZ (Aug. 31, 2015), ECF No. 149)). Further, a finding to the contrary—that the jury found the contract unambiguous but still found Lincoln Life liable to Lollytogs—would not prevent collateral estoppel if the other bases support it.

-11-

Therefore, we consider whether Wilson was not authorized to arrange for a convertible policy even if the policies themselves included a conversion right.

In answering its second interrogatory in the affirmative, the jury found that the July 13, 2000 Fax "modified the subject Term Policies and gave [Lollytogs] the right to convert the Term Policies to whole or universal life insurance policies through the end of the level premium periods." *Id.* at *11 (citation omitted). The jury's finding on this issue supported Lincoln Life's liability to Lollytogs, but it also logically entailed a finding that Lincoln Life ratified Wilson's actions in selling this policy. Lincoln's ratification of Wilson's alleged improper acts militates against its claim that he acted improperly in the sale of the policy.

To find ratification, there must be a manifestation of assent that the act will affect the principal's legal relations or conduct that justifies a "reasonable assumption that the [principal] so consents." *Elting v. Elting*, 849 N.W.2d 444, 418 (Neb. 2014) (quoting Restatement (Third) of Agency § 4.01) (2006)).[10] "Ratification of an agent's unauthorized acts may be made by overt action or inferred from silence and inaction." *Id.* (citation omitted). Ratification of an agent's act releases him from any liability he might otherwise have had to his principal for acting without authority. *See Barta v. Kindschuh*, 518 N.W.2d 98, 100–01 (Neb. 1994) (citations omitted).

In *Barta*, a couple whose home had a leaky roof retained a real estate agent to assist them in the sale of their home. *Id.* at 99. The realtor presented them with a disclosure form that "stated that the roof was in good condition." *Id.* They read the form and, despite knowing that it contained incorrect information, signed it anyway.

---

[10]The district court stated that "[t]he parties are in agreement that Nebraska substantive law applies in the present action."*Lincoln I*, 2015 WL 9048679, at *3. On appeal, neither party has objected to the district court's use of New York law for the collateral estoppel analysis and Nebraska law for the law of agency. Therefore, we do the same.

*Id.* They claimed that they only did so because "they assumed [the realtor] would make the necessary changes to the form." *Id.* However, the realtor claimed that he "left it to them to decide what information to disclose on the form" and made no changes to the couple's response. *Id.* at 99–100.

Another couple eventually bought the house and discovered several problems with it after the sale went through. *Id.* at 100. They filed suit against the sellers for misrepresentation based on their assurance that the roof was in good condition. *Id.* The sellers subsequently filed a third-party action against the realtor on the basis that he "was their agent in the sale and . . . should be liable for any losses incurred because of his actions as sellers' agent." *Id.* The trial court granted summary judgment in favor of the realtor, and the Supreme Court of Nebraska affirmed. *Id.*

The court acknowledged that a real estate agent is bound by the law of agency, including the principle that "[w]hen an agent fails to fulfill his agency duties, the agent may be held liable to the principal for losses suffered by the principal." *Id.* (citations omitted). However, the court recognized that this maxim does not apply if the principal "authorized . . ., or otherwise acquiesced in or ratified such acts." *Id.* (citation omitted). The court concluded:

> We therefore find that even if [the real estate agent] exceeded his authority as sellers' agent by failing to change the form to reflect the information provided by sellers, the law will not afford sellers protection for ignoring the obvious. When sellers read and signed the form which included misrepresentations regarding the condition of the roof, sellers acquiesced in and ratified the acts of their agent, thereby releasing the agent from liability to sellers for the resulting damages.

*Id.* at 102.

Lincoln Life disparages Wilson's work in the sale of the Lollytogs policy. But, it alleges no malfeasance on his part in arranging for the policy. Further, the record in the prior action indicated that by July 2000, there had been substantial communication among Lollytogs, Wilson, Lincoln Life, and Second Opinion regarding the possibility that the policy was not convertible. Moreover, Lincoln Life possessed the most pertinent information from the outset. Specifically, it knew its own customary practice of not selling convertible policies to people over 70 years old, Samuel's age at the time of application, and the terms of the policies it had drafted. The fax Trevino sent acknowledges that the policyholder's 70th birthday is *usually* the triggering event if it comes before the end of the level premium period. Nonetheless, it indicates that Stan Shelley, Vice President of the Customer Service Department, instructed Trevino to convey that the policy would be convertible "up to the term of the policy." Decl. of Joshua Mallin, Ex. 2., at 2. The jury was instructed on ratification and modification, and it found that the 2000 Fax modified the policy such that Samuel's age was no longer a barrier to conversion.

As discussed at oral argument, the district court in the prior action did not provide an interrogatory that spoke explicitly to ratification. And the jury instructions did not expressly address how a ratification affects an agent's liability to the principal. Still, the second interrogatory makes clear that the jury concluded that Lincoln Life ratified any discrepancy as to convertibility of the policy that may have resulted from Wilson's actions. Under *Barta*, such a finding absolves Wilson of any liability to Lincoln Life, his principal, with respect to this transaction.

The district court concluded its analysis as follows:

> As a matter of law, the verdict returned by the jury in the New York litigation precludes [Lincoln Life] from claiming that Wilson is liable for any portion of the money judgment the Lollytogs shareholders obtained against it. The jury's first finding was either based upon a determination that the term policies' conversion language is ambiguous,

-14-

or upon a determination that Wilson was authorized by [Lincoln Life] to sell the policies with conversion rights and that the policies as delivered did not reflect the terms of the sale. The jury's second finding establishes that to the extent Wilson may have acted without authority, or negligently, [Lincoln Life] ratified the sale of the policies with conversion rights.

*Lincoln I*, 2015 WL 9048679, at *15.

To be sure, the jury in the prior action did not directly decide the identical claims made by Lincoln Life against Wilson in this suit. The prior action concerned Lincoln Life's liability to Lollytogs. This suit concerns Wilson's liability to Lincoln Life for its liability to Lollytogs. But, the jury's factual findings establish certain facts that would be the same for both lawsuits. The facts found by the jury in the prior action are irreconcilable with Wilson being liable to Lincoln Life for its damages payable to Lollytogs on any theory of liability it has pleaded against him. Additionally, the application of collateral estoppel in this case complies with "general notions of fairness." *D'Arata*, 564 N.E.2d at 639 (citation omitted). Accordingly, we affirm the grant of summary judgment.

## B. *Affirmative Defenses*

Following the entry of summary judgment on Lincoln Life's claims, the parties filed motions in limine. Relevant to this appeal, the district court ruled in Wilson's favor, stating "Plaintiff cannot offer evidence that Defendant breached the agent's agreement or was negligent in the placement of insurance for Lollytogs with Plaintiff." *Lincoln Benefit Life v. Wilson (Lincoln II)*, No. 4-13-cv-03210-RGK-CRZ, 2016 WL 8376401, at *1 (D. Neb. Mar. 24, 2016). Lincoln Life subsequently moved for clarification as to which of its nine affirmative defenses were not barred by the collateral estoppel ruling. Four were either withdrawn or held moot, leaving five for the district court's further consideration: (1) negligence, (2) waiver and estoppel, (3) unclean hands, (4) judicial estoppel, and (5) failure of consideration.

-15-

The court concluded that the negligence defense fell squarely within the purview of the summary judgment order and limine order. The waiver and estoppel defense was based on a contract provision that allowed Lincoln Life to terminate the agreement with Wilson and withhold commissions if he "commit[s] any act that injures the business or reputation of [Lincoln Life]." *Lincoln Benefit Life v. Wilson (Lincoln III)*, No. 4-13-cv-03210-RGK-CRZ, 2016 WL 2755332 (D. Neb. May 11, 2016) (emphasis omitted) (citation omitted). The court held that this was, in essence, a defense based on breach of contract and was therefore barred by its previous orders. The court also noted that "[e]ven if this affirmative defense were not precluded, Lincoln Benefit has never claimed that the Agent's Agreement was terminated, which is a condition precedent to cessation of the agent's right to a commission under the 'Termination' clause." *Id.* at *3 n.5. The court permitted Lincoln Life to maintain its failure-of-consideration defense to the extent that it was not based on matters the court held precluded.[11]

On appeal, Lincoln Life challenges the district court's ruling as to the motion in limine and the negligence, waiver and estoppel defenses. We review these rulings for an abuse of discretion. *See Countrywide Servs. Corp. v. SIA Ins. Co.*, 235 F.3d 390, 394 (8th Cir. 2000).

Lincoln Life argues that the district court should not have prohibited it from offering arguments and evidence about Wilson's alleged failures in the fulfillment of his role as agent. Collateral estoppel "bars relitigation of an *issue*." *Tydings v. Greenfield, Stein & Senior, LLP*, 897 N.E.2d 1044, 1046 (N.Y. 2008) (emphasis added). Here, the prior action did not litigate whether Wilson abided by his agreement with Lincoln Life. That case did resolve, however, that Lincoln Life was the party responsible for damages to Lollytogs. This necessarily implicated all of Lincoln

---

[11]Because they are not relevant to this appeal, we do not address the other affirmative defenses.

Life's claims for relief against Wilson and a substantial aspect of its defenses to his counterclaim. It stands to reason that Lincoln Life cannot assert a defense that would require a contrary finding. Notably, the district court left Lincoln Life's failure-of-consideration defense partially intact. A finding of failure of consideration would not necessarily conflict with the collateral estoppel ruling.

We are also unpersuaded by Lincoln Life's alternative argument that it should have been able to defend against Wilson's claims on the basis that he had harmed its business or reputation. The paragraph in the Agent's Agreement on which it relies states in relevant part:

> Termination . . . .Your right to any commission or other thing of value shall cease if you: commit any act that injures the business or reputation of [Lincoln Life]; fail to account for and remit promptly any monies collected by you for [Lincoln Life]; or withhold any policies, money or other property belonging or returnable to [Lincoln Life].

*Lincoln III*, 2016 WL 2755332, at *2 (citation omitted).

We agree with the district court's interpretation of the provision. The cessation of the right to commission is only operable upon termination for a prohibited act. Because Lincoln Life never claimed to have terminated the agreement, the district court did not abuse its discretion by not allowing Lincoln Life to raise the provision as a defense.

In summary, we hold that the district court did not err in precluding Lincoln Life from pursuing the aforementioned affirmative defenses.

## C. *Prejudgment Interest*

Lincoln Life asserts that the district court improperly awarded prejudgment interest. "State law governs whether a diversity litigant may recover pre-judgment

-17-

interest." *Lincoln Benefit Life Co. v. Edwards*, 243 F.3d 457, 462 (8th Cir. 2001) (citation omitted). "[W]hether prejudgment interest should be awarded is reviewed de novo on appeal." *Countryside Co-op. v. Harry A. Koch Co.*, 790 N.W.2d 873, 889 (Neb. 2010) (citations omitted).[12]

The applicable statute governing prejudgment interest states:

Unless otherwise agreed, interest shall be allowed at the rate of twelve percent per annum on money due on any instrument in writing, or on settlement of the account from the day the balance shall be agreed upon, on money received to the use of another and retained without the

---

[12]Both parties cite the same case for the proposition that our standard of review of this issue is for an abuse of discretion. *See Soc'y Nat'l Bank v. Parsow P'ship, Ltd.*, 122 F.3d 574, 576 (8th Cir. 1997). However, *Parsow* states, "In a federal diversity action, the law of the state where the cause of action arises governs the award of prejudgment interest. Under Nebraska law, a trial court's decision to award interest *as part of an equitable remedy* is reviewed for abuse of discretion." *Id.* at 576 (emphasis added) (citations omitted). The instant case, in our view, is an action at law, not equity. The counterclaim is subheaded "Declaratory Judgment For Breach of Contract." Answer to the Compl. & Praecipe & Countercl. at 16, *Lincoln Benefit Life v. Wilson*, Case No. 4-13-cv-03210-RGK-CRZ (Jan. 15, 2014), ECF No. 17. "A suit for declaratory judgment is an action *sui generis* and may involve questions of law or equity or both; whether a declaratory judgment action is treated as an action at law or one in equity is to be determined by the nature of the dispute. When the essence of the dispute sounds in contract, the action is to be treated as one at law." *Lone Cedar Ranches, Inc. v. Jandebeur*, 523 N.W.2d 364, 367–68 (Neb. 1994) (citations omitted). Additionally, Wilson demanded a jury trial, and the case was heard by a jury. Nebraska courts "have traditionally denied jury trials in equitable actions and provided jury trials as a matter of right in legal actions." *Eihusen v. Eihusen*, 723 N.W.2d 60, 63 (Neb. 2006).

Accordingly, we review de novo the prejudgment interest award.

owner's consent, express or implied, from the receipt thereof, and on money loaned or due and withheld by unreasonable delay of payment. Unless otherwise agreed or provided by law, each charge with respect to unsettled accounts between parties shall bear interest from the date of billing unless paid within thirty days from the date of billing.

Neb. Rev. Stat. Ann. § 45-104. Prejudgment interest is appropriate only for liquidated damages; damages are liquidated "only when no reasonable controversy exists as to either plaintiff's right to recover or as to the amount of such recovery." *Edwards*, 243 F.3d at 462 (cleaned up).

In the order granting Wilson's motion for judgment as a matter of law, the district court stated that

Wilson proved a breach of contract and damages and no reasonable jury could conclude otherwise. In that same vein, [Lincoln Benefit]'s affirmative defense of lack of consideration fails as a matter of law and also because no reasonable jury could conclude that there was a lack of or failure of consideration.

*Lincoln Benefit Life v. Wilson (Lincoln IV)*, No. 4-13-cv-03210-RGK-CRZ, 2017 WL 108016, at \*3 (D. Neb. Jan. 11, 2017). It subsequently "f[ou]nd that Wilson's claims are liquidated because there is no reasonable controversy either as to the amounts due or as to his right to recover, and that prejudgment interest therefore is recoverable under Neb. Rev. Stat. § 45-104." *Id.* We find no error in this determination and affirm.

### III. *Conclusion*
Accordingly, we affirm the judgment of the district court.

————————————————